IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

VERULUX, LTC., et al.,

        Plaintiff,      Case No. 3:09 CV 823
 -vs-
                     MEMORANDUM OPINION
JOHN JOHNSTON, et al.,

        Defendant.

KATZ, J.

   This matter is now before the Court on the motion of the defendants to dismiss for lack of personal jurisdiction (Doc. 18). The plaintiffs have filed a response (Doc. 22), and the defendants a reply (Doc. 23). The motion will be granted.

**I. Background**

   Where the defendant files a properly supported motion to dismiss for lack of personal jurisdiction, "the plaintiff may not stand on his pleadings but must, by affidavit or otherwise, set forth specific facts showing that the court has jurisdiction." *Theunissen v. Matthews d/b/a Matthews Lumber Transfer*, 935 F.2d 1454, 1458 (6th Cir.1991). The question at this stage of the proceedings, however, is merely whether the plaintiff has made a *prima facie* showing that this Court has personal jurisdiction over the defendants. Because the Court has not held an evidentiary hearing on the motion now at issue, "the facts asserted by the plaintiff must be taken as true." *Advanced Polymer Sciences, Inc. v. Phillips Indus. Services*, 34 F.Supp.2d 597 (N.D.Ohio,1999).

   Those facts are as follows. Plaintiffs Grahame Burrow and Chris Orchard are Ohio residents who, during the relevant time period, worked in Northwood, Ohio, for NorPlas, a subsidiary of a Canadian automotive supply company. In late September or early October 2008, Burrow was on his way back to Ohio from a corporate meeting in Toronto, Canada, when he went

to pick up plaintiff Kari Strausbaugh, a Michigan resident who worked for EK Associates, from a facility operated by defendant QTech Systems, Inc., in St.. George, Ontario, Canada. At that time, Burrow was introduced to defendant John Johnston, a Canadian, who gave Burrow a brief tour of QTech's facility and showed him some sample lights utilizing Light Emitting Diode ("LED") technology.

Subsequently, on November 18, 2008, Burrow and Orchard traveled to St. George, Ontario, Canada, where they met with Johnston to explore their mutual interest in LED lighting technologies. It was at this meeting that Burrow and Orchard purportedly entered into non-disclosure and confidentiality agreements (NDAs) with Johnston. Strausbaugh had allegedly entered into a non-disclosure agreement with Johnston at an earlier point.

On November 24, 2008, Johnston traveled to meet with Burrow and Orchard in Northwood, Ohio, where Johnston showed Burrow various LED prototypes. That evening, Johnston, Burrow, Eddie Kmit, owner of EK Associates, Strausbaugh, and Orchard participated in another meeting at Burrow's house in Sylvania, Ohio, where they engaged in discussions concerning the development, manufacturing and marketing of the LED light fixtures. In addition, the parties discussed forming a business entity. Johnston stayed overnight at Burrow's house.

The next day, Johnston, Burrow, and Strausbaugh had another meeting at a restaurant in Toledo, Ohio. During that meeting, Johnston and Burrow negotiated an agreement whereby Burrow would loan up to $500,000 to a business entity to be formed to exploit the use of LED in lighting fixtures. In exchange, Burrow would receive 39% interest in the company, while Strausbaugh and Kmit would each receive a 5% interest. Johnston would hold a 51% interest. The

new company was to be known as MetroLED International, Inc ("MLI"), and would issue stock to its respective owners. These meetings marked the only time Johnston was in Ohio.

On or about December 1, 2008, pursuant to agreements reached during the Ohio meetings, Burrow sent $25,000 from Ohio to Johnston to use as start-up capital for MLI. At the same time, Johnston signed, on behalf of defendant Grafton Canada Ltd. ("Grafton"), a company he owned, a promissory note whereby Johnston, on behalf of Grafton, promised to repay Burrow the $25,000 that he had lent as start-up capital within 45 days if a share purchase had not been completed by that time.

On or about December 2, 2008, Johnston incorporated MLI in Canada. The next day, Johnston sent to Orchard, at his office in Northwood, Ohio, a copy of the Articles of Incorporation. Throughout the next few weeks, the parties engaged in several conference calls from their respective offices where they discussed matters relating to the formation of MLI. On December 17, 2008, Johnston, Burrow, Kmit, Strausbaugh, and Orchard met in St. George, Ontario, Canada, to further discuss MLI-related issues. On December 22, Burrow sent $3,362 from Ohio to Johnston to pay a sales representative retained by Johnston prior to the parties' agreement to form MLI. The same day, Johnston, on behalf of Grafton, signed a promissory note promising to repay to the $3,362 that he had lent as a credit towards Burrow's full amount of share purchase of MLI capital stock within 45 days if a share purchase had not been completed by that time.

In January 2009, Kmit withdrew his and EK Associates' participation in the new venture due to a dispute as to his compensation. During the same month, Strausbaugh quit her employment with EK Associates in order to become a full time employee of MLI.

Johnston, upon Kmit's withdrawal, voiced concern that Kmit would sue MLI

3

claiming an interest in the company and its technology. Thereafter, Johnston incorporated a Canadian business entity known as ProTerra Led, Inc. ("PTL"). Johnston said that MLI would become inactive and that the development, manufacturing, and sale of the LED light fixtures being developed by MLI would instead take place under PTL. Johnston also indicated that he might not issue 5% of PTL's capital stock to Strausbaugh until the issues with Kmit were resolved.

Burrow and Orchard were duly made officers of PTL, and, from Ohio, conducted various business activities on its behalf. During January 2009, Burrow, Orchard, and Strausbaugh spent the better part of two weeks attempting to organize PTL. On a number of occasions, Orchard and Strausbaugh, from Ohio, asked Johnston to have PTL issue capital stock. Each time Johnston was evasive when the subject of the issuance of capital stock was raised. Burrow, from Ohio, also discussed with Johnston the retirement of the promissory notes owed to him and the issuance of capital stock, and Johnston was again evasive.

In late January 2009, Johnston indicated to Burrow, Orchard, and Strausbaugh that he had met with his partners in his other various business endeavors and informed them that they would have to vacate the building that PTL planned to use for its offices and manufacturing. Burrow, Orchard and Strausbaugh, by telephone from Ohio, questioned the need for other businesses to vacate the building, as PTL did not need all of the space and could not yet pay for it.

At around the same time, Johnston sent to Burrow a lease agreement for PTL to pay to one of Johnston's business entities $5.50 per square foot, per year, for 17,500 square feet, and asked Burrow to sign the lease on behalf of PTL. Contemporaneously, a partner of Johnston invoiced PTL, requesting a check for approximately $8,000 for February 2009 rent. When Burrow, from Ohio,, questioned the amount of the rent payment, Johnston responded that the building was up for

4

sale and he needed a long-term lease to make the building attractive. Johnston claimed that the sale of the building would free capital for him to invest in PTL.

On or about February 11, 2009, Burrow, from Ohio, sent $85,000 to Johnston to be utilized for start-up capital for PTL. On the same day, Johnston signed, on behalf of PTL, a promissory note whereby Johnston, on behalf of PTL, promised to repay to Burrow the $85,000 that he had lent as credit towards the full amount of a share purchase of PTL capital stock.

On February 16, 2009, Burrow and Johnston met in St. George, Ontario, Canada, to discuss the future of PTL and their involvement in it. Johnston indicated at that meeting that he wanted to restructure his holding to merge PTL with other business entities, including Grafton. Burrow indicated to Johnston that he would end his involvement with PTL unless certain associates of Johnston's stopped intervening in PTL affairs, Johnston's other business entities separated completely from PTL, and issues relating to ownership of PTL were resolved. Johnston responded that he considered Burrow's involvement to be critical. Burrow agreed to email Johnston a proposal for reorganizing PTL. That evening, Burrow emailed Johnston a proposal for restructuring PTL and allocating ownership interests.

The next day, Burrow called Johnston to confirm receipt of the email. Johnston quickly changed the subject. Burrow indicated to Johnston that if they could not reach agreement, the payroll obligations that PTL was assuming for Johnston's other business entities could be in jeopardy. Johnston, in an email sent the same day, indicated that he would be meeting with his shareholders on February 19, 2009, and would respond to Burrow's proposal on the 20th. By this time, Burrow and Orchard had already concluded that they, along with Strausbaugh, must withdraw from PTL.

5

On February 20, 2009, Burrow received Johnston's response to Burrow's proposal. Johnston indicated that he and his associates could not accept Burrow's proposal. Johnston demanded that Burrow and Orchard withdraw as officers of PTL and return all funds withdrawn from PTL's account in repayment of loans to PTL made by Burrow. Johnston also demanded that Burrow, Orchard, and Strausbaugh honor the NDAs they had allegedly signed which precluded them from exploiting LED lighting technology. On March 3, 2009, Johnston's counsel initiated telephone calls to Burrow, Orchard, Strausbaugh, and their attorney, indicating that they could not exploit LED lighting technology due to the NDAs.

Burrow, Orchard, and Strausbaugh have now formed plaintiff Verulux, Ltd., an Ohio limited liability company with its principal place of business in Ohio. Verulux is currently preparing to manufacture and market LED lighting fixtures from northwest Ohio. In this suit, the plaintiffs seek a declaratory judgment resolving issues relating to the NDAs. Burrow, Orchard, and Stansbaugh also bring a claim for alleged fraudulent misrepresentations made by Johnston at the Ohio meeting. In addition, Burrow seeks recovery on the promissory notes signed by Johnston, and Burrow and Stansbaugh seek reimbursement from PTL for expenses they incurred on its behalf.

**II. Discussion**

In order for this Court to assert personal jurisdiction over a defendant, "the defendant must be amenable to suit under the forum state's long-arm statute and the due process requirements of the Constitution must be met." *Reynolds v. International Amateur Athletic Federation*, 23 F.3d 1110, 1115 (6th Cir. 1994).

***A. Ohio's Long-Arm Statute***

6

In invoking this Court's jurisdiction over their claims, the plaintiffs rely on the provision of Ohio's long-arm statute permitting jurisdiction over a defendant where the cause of action arises from a defendant's "[t]ransacting any business in [Ohio]". Ohio Rev. Code § 2307.382(A)(1). As interpreted by the Ohio courts, "the broad wording of the statute permits jurisdiction over non-resident defendants who are transacting any business in Ohio." *Kroger Co. v. Malease Foods Corp.*, 437 F.3d 506, 511 (6th Cir. 2006). The phrase "transact" means "to *prosecute negotiations*; to carry on business; *to have dealings*." *Id*. (quoting *Kentucky Oaks Mall v. Mitchell's Formal Wear*, 53 Ohio St.3d 73, 75 (1990) (emphasis in original).

The "transacting business" provision of the Ohio long-arm statute does not permit jurisdiction over the plaintiffs' declaratory judgment claim. That claim seeks for this Court to adjudicate the rights of the parties under NDAs that, so far as the record shows, were prepared by Canadian lawyers and executed in Canada. The only relationship asserted between the declaratory judgment claim and Ohio is that Johnston's counsel initiated telephone calls warning Burrow, Orchard, and their attorney to comply with the NDAs, and these calls were received in Ohio. But courts have found, in analogous contexts, that merely seeking to enforce an agreement within Ohio, standing alone, does not constitute "transacting business" in Ohio. See *Hildebrand v. Steck Mfg. Company, Inc.*, 279 F.3d 1351, 1354 (Fed. Cir. 2002) (sending infringement "warning letters" into Ohio did not constitute "transacting business" within the meaning of the Ohio long-arm statute); *Matrix Essentials v. Harmon Stores Inc.*, 205 F.Supp.2d 779, 785-786 (out-of-state defendant's negotiation of settlement agreement with Ohio plaintiff by telephone and mail did not constitute "transacting business" with Ohio plaintiff).

Furthermore, the record shows that, at the time the NDAs were allegedly entered into, negotiations between Burrow, Orchard, and Johnston regarding a joint venture were still at a preliminary stage; no agreement as to any joint venture had yet been reached; and Johnston had not yet traveled to Ohio. In this posture, it cannot be said that the plaintiffs' declaratory judgment claim relates to the defendants' "transacting any business in Ohio."[1]

## *B. Due Process*

The remaining claims in this suit involve fraudulent misrepresentations Johnston allegedly made during negotiations in Ohio; several promissory notes signed by Johnston on behalf of Canadian corporations in Canada that relate to earlier business discussions in Ohio; and a reimbursement agreement formed in Ohio. The Court will assume that each of these claims falls within the reach of the "transacting business" provision of Ohio's long-arm statute, as each arguably relates to business negotiations that took place in Ohio. It remains to be determined, however, whether this Court has personal jurisdiction over these claims under the Due Process Clause of the Fourteenth Amendment.

The constitutional concept of due process "requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). The Sixth Circuit has interpreted the "minimum contacts" test to require: 1) that the

---

[1] Even if this Court had jurisdiction over the plaintiffs' declaratory judgment claim under the Ohio long-arm statute, personal jurisdiction would still not be proper under the Due Process Clause. See *Genetic Implant Systems, Inc. v. Core-Vent Corp.*, 123 F.3d 1455 (Fed. Cir. 1997) ("[S]ending infringement letters, without more activity in a forum state, is not sufficient to satisfy the requirements of due process.")

8

defendant "purposefully avails" himself of the privilege of acting in the forum state; 2) that the cause of action arise from the defendant's activities in the forum state; and 3) that the activities of the defendant be substantial enough in the forum state to make the exercise of jurisdiction reasonable. *Reynolds*, 23 F.3d at 1116.

The Court finds that it may not exercise personal jurisdiction over any of the remaining claims in this suit consistent with the first and third prongs of the Sixth Circuit's test.

**1. "Purposeful Availment"**

The "purposeful availment" requirement is satisfied when the defendant's contacts create a "substantial connection" with the forum state such that the defendant "should reasonably anticipate being haled into court there." *CompuServe Inc. v. Patterson*, 89 F.3d 1257, 1263 (6th Cir. 1996) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474-75 (1985), and *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)). The purposeful availment requirement "ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or a third person." *Burger King*, 471 U.S. at 475 (internal quotation marks and citations omitted).

It is true that, in this case, Johnston came to Ohio to negotiate the formation of a new business entity with Burrow, Orchard, and Strausbaugh.[2] But the business entity was to be a Canadian company, incorporated and headquartered in Canada. Indeed, the two corporations produced as a result of this meeting, MLI and PTL, were both incorporated by Johnston in Canada, and the discussions between the parties assumed that both would have their base of operations in

---

[2] The Court, like the parties, will focus on Johnston's contacts with Ohio, because the record discloses no meaningful distinction between Johnston's contacts with Ohio and those of the other corporate defendants.

9

Canada. Johnston states in his affidavit that "[e]verything regarding [MLI and PTL] took place in Canada" and that "[a]ll of the goods and LED technology were to originate from Canada" (Doc. 19, Exh. A ["Johnston Affidavit"] at 4), and there is nothing in Burrow's affidavit (Doc. 22, Exh. 1) indicating to the contrary. It is telling that all meetings between the parties subsequent to MLI's incorporation took place in Canada.

In this case, then, Johnston's contacts with Ohio did not create a "substantial connection" with or a "continuing obligation" to the forum state. Instead, Johnston's contacts with Burrow and Orchard in Ohio looked to the formation of a Canadian corporation that was to be based in and operated from Canada. The new corporation's only continuing tie to Ohio was that two of its officers, Burrow and Orchard, lived there. But Burrow, Johnston, and Orchard's continuing obligations arising from their Ohio meeting were to the planned Canadian entity, not anything specific to Ohio. See *Burger King*, 471 U.S. at 479 ("[P]rior negotiations and contemplated future consequences, along with the terms of the contract and parties' actual course of dealing" must be considered to determine whether "the defendant purposefully established minimum contacts within the forum.").

Indeed, it would be fairer to say that Burrow and Orchard created a "substantial connection" to Canada as result of their meetings with Johnston in Ohio, than that Johnston created a "substantial connection" to Ohio as a result of his meetings with Burrow and Orchard. And while the plaintiffs point to the telephone and email communication made by Johnston to Burrow and Orchard in Ohio, "the use of interstate facilities such as the telephone and mail is a secondary or ancillary factor and cannot alone provide the minimum contacts required by due process." *Reynolds*, 23 F.3d at 1119 (internal quotation marks omitted).

10

Thus, any ties Johnston or the defendant corporations have to Ohio arose solely from the fact that Burrow and Orchard lived there, a circumstance which, in the context of this case, may properly be characterized as "random." See *Calphalon Corp. v. Rowlette*, 228 F.3d 718, 723 (6th Cir. 2000) (finding no purposeful availment where "[the defendant's] phone, mail, and fax contact with [the plaintiff] in Ohio and [the defendant]'s physical visits there occurred solely because [the plaintiff] chose to be headquartered in Ohio, not because [the defendant] sought to further its business and create 'continuous and substantial' consequences there."). Johnston therefore did not create a "substantial connection" to Ohio as a result of his efforts to form a Canadian business entity.

## 2. "Arising From"

As to the "arising from" requirement, the Sixth Circuit has said that "[i]f a defendant's contacts with the forum state are related to the operative facts of the controversy, then an action will be deemed to have arisen from those contracts." *CompuServe*, 89 F.3d at 1267. In this case, the Court presently has no basis to reject the plaintiffs' assertions that the operative facts of their claims arose from the Ohio meeting, and thus the claims in this suit "arose from" the defendants' contacts with Ohio within the meaning of the second prong.

## 3. Reasonableness

The Court finds that Johnston's activities in Ohio were not substantial enough to make the exercise of jurisdiction reasonable, as required by the third prong of the Sixth Circuit's personal jurisdiction test.

Determining whether the exercise of personal jurisdiction is "reasonable" involves a balancing of three factors: "the burden on the defendant, the interests of the forum State, and the

11

plaintiff's interest in obtaining relief." *City of Monroe Employees Ret. Sys. v. Bridgestone*, 399 F.3d 651, 666 (6th Cir.2005) (quoting *Asahi Metal Indus. Co. v. Superior Court of Calif.*, 480 U.S. 102, 113 (1987)). The Supreme Court has cautioned that "[t]he unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders." *Asahi*, 480 U.S. at 114. But the Sixth Circuit has indicated that the burdens on Canadian litigants called upon to litigate in American courts are "substantially lighter" compared to other foreign defendants. *Aristech Chemical Intern. Ltd. v. Acrylic Fabricators Ltd.*, 138 F.3d 624, 628-629 (6th Cir. 1998).

In this case, there is reason to believe that the burdens placed on the Canadian defendants by an Ohio forum, while perhaps not overwhelming, would still be substantial. See Johnston Affidavit at 5 ("Defending this lawsuit in Ohio would be financially debilitating to me and the Companies"). As to the second and third prongs, Ohio certainly has an interest in protecting the rights of its citizens, and the plaintiffs certainly have an interest in obtaining relief in this suit. But the interests of Ohio and the plaintiffs in an Ohio forum are counterbalanced by the fact that the underlying controversy in this case involves a dispute over matters relating to the formation of two Canadian entities, and by the fact that Canada stands as a reasonable alternative forum in which the plaintiffs might obtain their desired relief. Therefore, considering all three factors, exercising personal jurisdiction over the defendants in this suit would not be reasonable: the defendants' contacts with this forum are attenuated; Ohio's interest in the underlying controversy is slight; and the plaintiffs may pursue their claims in a Canadian court.

**III. Conclusion**

For the foregoing reasons, the plaintiffs have not made a *prima facie* showing that this Court has personal jurisdiction over the claims in this suit. The motion to dismiss for lack of personal jurisdiction (Doc. 18) is therefore granted, and the case is closed.

IT IS SO ORDERED.

                s/ *David A. Katz*
                DAVID A. KATZ
                U. S. DISTRICT JUDGE